# UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| Francisco Carrillo, Jr., ) | No. 12-57229 |
|     Plaintiff/Appellee, ) | |
| ) | District Court No. |
| vs. ) | 2:11-cv-103010-SVW-AGR |
| ) | |
| County of Los Angeles, et al., ) | |
|     Defendants/Appellants ) | |
| Frank O'Connell, et al, ) | No. 13-56817 |
|     Plaintiffs/Appellees, ) | |
| ) | District Court No. |
| vs. ) | 2:13-cv-01905-MWF-PJW |
| ) | |
| J.D. Smith, et al., ) | |
|     Defendants/Appellants ) | |

Appeal From The United States District Court
For The Central District of California
Stephen V. Wilson, District Judge and Michael W. Fitzgerald,
District Judge

## PETITION FOR REHEARING AND
## SUGGESTION FOR REHEARING *EN BANC*

JIN S. CHOI, STATE BAR NO. 180270
MICHAEL D. ALLEN, STATE BAR NO. 198126
LAWRENCE BEACH ALLEN & CHOI, P.C.
100 West Broadway, Suite 1200
Glendale, California 91210
jchoi@lbaclaw.com
mallen@lbaclaw.com
(818) 545-1925 Telephone
(818) 545-1937 Facsimile
Attorneys for Defendants-Appellants

# UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| Francisco Carrillo, Jr., | ) | No. 12-57229 |
|     Plaintiff/Appellee, | ) | |
| | ) | District Court No. |
| vs. | ) | 2:11-cv-103010-SVW-AGR |
| | ) | |
| County of Los Angeles, et al., | ) | |
|     Defendants/Appellants | ) | |
| | ) | |
| Frank O'Connell, et al, | ) | No. 13-56817 |
|     Plaintiffs/Appellees, | ) | |
| | ) | District Court No. |
| vs. | ) | 2:13-cv-01905-MWF-PJW |
| | ) | |
| J.D. Smith, et al., | ) | |
|     Defendants/Appellants | ) | |

Appeal From The United States District Court
For The Central District of California
Stephen V. Wilson, District Judge and Michael W. Fitzgerald,
District Judge

## PETITION FOR REHEARING AND SUGGESTION FOR REHEARING *EN BANC*

# TABLE OF CONTENTS

**Page**

STATEMENT REQUIRED BY FRAP 35(b)(1) ........................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................ 4

I.   THE NEXUS BETWEEN *BRADY* OBLIGATIONS AND
     POLICE OFFICERS WAS ONLY ESTABLISHED BEYOND
     DEBATE IN THIS CIRCUIT BY THE 2009 *TENNISON*
     DECISION ................................................................................... 4

     A.   *Butler* Held That The Failures To Disclose Exculpatory
          Evidence Constituted Violations Of The *Prosecutor's*
          Duties Under *Brady v. Maryland* ................................................ 6

     B.   The Panel Decision Cannot Be Reconciled With The Fact
          That This Specific Constitutional Question Was Not
          Rendered Beyond Debate Until 2009 ........................................ 9

II.  AT THE VERY MINIMUM, TO THE EXTENT PLAINTIFFS
     IN THE *O'CONNELL* CASE ASSERT THAT
     "IMPEACHMENT" TYPE EVIDENCE WAS NOT
     DISCLOSED, THE PANEL ERRED IN NOT APPLYING
     QUALIFIED IMMUNITY ON A LIMITED SCOPE ...................... 14

     A.   Prior to the Underlying 1984 Investigation in *O'Connell*,
          Courts Had Distinguished "Impeachment" Evidence
          From "Exculpatory" Evidence for Purposes of the
          Disclosure Requirements Under *Brady* .................................... 16

     B.   Long After the Underlying 1984 Investigation, Courts
          Continued to Debate Whether "Impeachment" Evidence
          Falls Within the Parameters of *Brady* ...................................... 19

III. CONCLUSION .................................................................................. 22

CERTIFICATE OF COMPLIANCE ............................................................ 23

CERTIFICATE OF SERVICE ................................................................... 24

# TABLE OF AUTHORITIES

**Page**

CASES

*Bagley v. Lumpkin*,
719 F. 2d 1462 (9th Cir. 1983) ....................................................... 18, 22

*Barts v. Joyner*,
865 F.2d 1187 (11th Cir. 1989) ............................................................ 13

*Brady v. Maryland*,
373 U.S. 83 (1963) ............................................................... 1, 4, 6, 17

*Carrillo v. County of Los Angeles*,
__ F.3d. __, 2015 WL 5024010 (2015) ....................................... passim

*City & Cnty. of San Francisco v. Sheehan*,
135 S.Ct. 1765 (2015)..................................................................... 5, 16

*Drumgold v. Callahan*,
707 F.3d 28 (1st Cir. 2013)................................................................. 20

*Gantt v. City of Los Angeles*,
717 F.3d 702 (9th Cir. 2013) .............................................................. 11

*Giglio v. United States*,
405 U.S. 150 (1972) ........................................................................... 21

*Graham v. Connor*,
490 U.S. 386 (1989) ............................................................................. 5

*Gunter v. Meeks*,
2013 WL 5493270 (D. Nev. Sept. 30, 2013) ...................................... 11

*Haley v. City of Boston*,
657 F.3d 39 (1st Cir. 2011)............................................................ 21, 22

*Martinez v. Palmer*,
2015 WL 5554147 (D. Nev. Sept. 21, 2015) ...................................... 11

*Mazzetti v. Bellino*,
2014 WL 4186662 (E.D. Cal. Aug. 21, 2014) .................................... 12

*People v. Green*,
130 Cal.App. 3d 1 (Cal. Ct. App. 1982)............................................. 18

*Reid v. Simmons*,
163 F.Supp.2d 81 (D. N.H. 2001) ................................................. 20, 21

*Ross v. City of Oakland*,
2015 WL 4365309 (N.D. Cal. July 14, 2015) ..................................... 11

*Smith v. Almada,*
    640 F.3d 931 (9th Cir. 2011) ................................................................ 11

*Tennison v. City and County of San Francisco,*
    570 F.3d 1078 (9th Cir. 2009) ................................................ 2, 10, 11, 12

*U.S. v. Bagley,*
    473 U.S. 667 (1985) ................................................................................ 18

*U.S. v. Gantt,*
    617 F.2d 831 (D.C. Cir. 1980) ................................................................ 18

*U.S. v. Mackey,*
    571 F.2d 376 (7th Cir. 1978) .................................................................. 17

*United States v. Blanco,*
    392 F.3d 382 (9th Cir. 2004) .................................................................. 10

*United States v. Buchanan,*
    891 F.2d 1436 (10th Cir. 1989) ................................................................ 8

*United States v. Butler,*
    567 F.2d 885 (9th Cir. 1978) ..................................................... passim

*United States v. Endicott,*
    869 F.2d 452 (9th Cir. 1989) .................................................................... 8

*United States v. Sanchez,*
    813 F.Supp. 241 (S.D.N.Y. 1993) ............................................................ 8

*Walker v. Lockhart,*
    763 F.2d 942 (8th Cir. 1985) .................................................................. 18

STATUTES

42 U.S.C. § 1983 .......................................................................................... 1

RULES

FRAP 35(b)(1) .............................................................................................. 1

Ninth Circuit Rule 40-1 ............................................................................. 24

## STATEMENT REQUIRED BY FRAP 35(b)(1)

Defendants/Appellants ("Defendants") in *Carrillo v. County of Los Angeles, et al.*, No. 12-57229 and *O'Connell v. Smith, et al.*, No. 13-56817, seek panel rehearing and rehearing *en banc* of the Panel decision (Fisher, Raymond C., Bybee, Jay S., and Bea, Carlos T.) published on August 26, 2015.[1]  In this decision, the Panel affirmed the denial of qualified immunity sought by the individual Defendant police officers in *Carrillo* and *O'Connell* as to the Plaintiffs' 42 U.S.C. § 1983 claims alleging failures to comply with the disclosure requirements under *Brady v. Maryland*, 373 U.S. 83 (1963).[2]

Rehearing *en banc* of the Panel Decision is necessary to address the Panel's overly broad holding that the law in this Circuit was clearly established in 1978 that police officers had the same obligations as prosecutors to disclose "exculpatory" evidence (without distinguishing otherwise mere "impeachment" evidence) to criminal defendants, in

---

[1]  A copy of the Panel Decision, *Carrillo v. County of Los Angeles*, __ F.3d. __, 2015 WL 5024010 (2015), is attached to this Petition as Exhibit "1". The Panel granted Defendants a 21-day extension of the deadline to file this Petition.

[2] The qualified immunity rulings were issued in two separate 42 U.S.C. § 1983 actions, resulting in separate appeals.  These appeals were consolidated for purposes of oral argument, and the Panel Decision encompasses both appeals.

accordance with *Brady v. Maryland*.  The Panel held that the law was clearly established by dictum language in the decision of *United States v. Butler*, 567 F.2d 885 (9th Cir. 1978), a criminal case where the defendants' convictions were overturned due to the prosecutorial office's failure to have disclosed highly material, exculpatory evidence known by its prosecutors and investigating officers.

The Panel Decision, therefore, raises an issue of exceptional importance because it constitutes a dramatic departure from other recent Ninth Circuit decisions which addressed the issue as to whether police officers are subject to the same *Brady* disclosure obligations as prosecutors and, if so, to what extent.  Within this Circuit, this constitutional question was only answered beyond debate with the 2009 decision in *Tennison v. City and County of San Francisco*, 570 F.3d 1078 (9th Cir. 2009).  Accordingly, this Circuit's decisions have repeatedly cited *Tennison* – not *Butler* – as having clearly established the rule in this Circuit that at least some of the *Brady* obligations applicable to prosecutors also apply to police officers. Nevertheless, in affirming the denials of qualified immunity, the Panel held that this rule had already been established beyond debate by *Butler* in 1978. By now retroactively deciding that *Butler* clearly established the rule that

police officers are bound by the same *Brady* obligations as prosecutors, the Panel has run afoul of the Supreme Court's fundamental instruction that the denial of qualified immunity requires the law existing **at the time of the alleged violation** to have been clearly established beyond debate.

*En banc* review will allow this Court to correct the Panel's misapplication of *Butler*, while ensuring that future qualified immunity determinations in this constitutional setting will be not be usurped by the Panel's inappropriate reliance on *Butler*.

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.      **THE NEXUS BETWEEN *BRADY* OBLIGATIONS AND POLICE OFFICERS WAS ONLY ESTABLISHED BEYOND DEBATE IN THIS CIRCUIT BY THE 2009 *TENNISON* DECISION.**

In each action below, the police officer Defendants sought qualified immunity against Plaintiffs' claims that the officers had failed to disclose exculpatory evidence in violation of *Brady v. Maryland.* Defendants sought qualified immunity, arguing that the law relating to *Brady* obligations and police officers had not been clearly established in 1984 and 1991, respectively. Defendants argued that the continuing inter-Circuit conflict regarding the issue as to whether the same *Brady* obligations applicable to prosecutors apply to police officers and to what extent, and the fact that this Circuit had not addressed this issue until 2009, demonstrated that this constitutional question had not been settled beyond debate during the relevant time periods.

The United States Supreme Court has repeatedly held that an officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes

4

would have understood that he was violating it, meaning that **existing precedent placed the statutory or constitutional question beyond debate.**" *City & Cnty. of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1774 (2015) (emphasis added). The Supreme Court has also emphasized that the facts specific to each case are determinative and that the "clearly established law" as to the right in question must not be defined "at a high level of generality." *Id.* at 1775-76. It has further emphasized that "[c]ourts must not judge officers with 'the 20/20 vision of hindsight.'" *Id.* (quoting *Graham v. Connor,* 490 U.S. 386, 396 (1989)).

The Panel held that "the law at the time of the investigations [in 1984 and 1991] clearly established that police officers had to disclose material, exculpatory evidence under *Brady*, and second, that any reasonable officer would have understood that *Brady* required the disclosure of the specific evidence allegedly withheld." *Carrillo*, 2015 WL 5024010, at *1. In holding that this constitutional question had been established beyond debate, the Panel did not rely on a Supreme Court decision addressing *Brady*'s disclosure requirements as applied to police officers. The Panel also did not find that decisions from the other Circuits had placed this question beyond debate — nor could they due to the undisputed lack of consensus among the

Circuits that has persisted as evidenced by a number of published decisions in the last decade. *Id.* at *9-10 (noting that a "disagreement among circuit courts" could "imply a legal principle is not 'beyond debate'").

The Panel disregarded the implications of the continuing Circuit conflict by relying on the principle that such a conflict need not be considered if "binding precedent", in the form of a controlling Ninth Circuit decision, existed to render the constitutional question beyond debate in this Circuit. *Id.* at * 10. The Panel, however, erroneously treated *United States v. Butler*, 567 F.2d 885 (9th Cir. 1978) as such "binding precedent", thereby warranting rehearing *en banc* of the Panel decision.

A.    **<u>*Butler* Held That The Failures To Disclose Exculpatory Evidence Constituted Violations Of The *Prosecutor's* Duties Under *Brady v. Maryland*.</u>**

 In *Butler*, the criminal defendants appealed the denial of their motions for new trial after their convictions had been previously affirmed. They argued that they had learned that the government's key witness had been promised that his pending indictment would be dismissed if he testified against the defendants. The district court ruled that the newly discovered evidence would not have altered the jury's verdict. *Id.* at 886. The new

evidence "cast doubt upon corroborative testimony and assurances, by the prosecutor and two government agents" that the witness had not been promised anything.  *Id.* at 887.  Accordingly, *Butler* addressed "whether this apparent **effort of the prosecution to conceal the true nature of these dealings with its key witness** should have been found adequate to support a new trial order."  *Id.* at 888 (emphasis added).  *Butler* further held that a new trial should have been ordered based on the "[p]rosecution's acquiescence in and corroboration of [the witness]'s denials at trial", "followed by continued deception and half-truths on appeal and at the hearing on appellants' new trial motion."  *Id.* at 889.

Butler also addressed the district court's evidentiary finding that no one from the prosecutor's office had made any direct promises to the witness.  After emphasizing that "[t]he **prosecutor is responsible** for the nondisclosure of assurances made to his principal witnesses even if such promises by other government agents were unknown to the prosecutor," in dictum that was not necessary to the holding, the *Butler* Court noted that, "[s]ince the investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutor, were guilty of nondisclosure."  *Id.* at 891 (emphasis added).  Thus, whether the new trial

was based on either prosecutorial misconduct or undisclosed promises made by other agents, *Butler* based its holding on the prosecutor's failure to satisfy his *Brady* disclosure obligations. *See*, *United States v. Endicott*, 869 F.2d 452, 455 (9th Cir. 1989) (even if the prosecutors are not at fault for the nondisclosure, the disclosure responsibility belongs to the prosecutor, citing *Butler*); *United States v. Buchanan*, 891 F.2d 1436, 1442 (10th Cir. 1989) ("Knowledge by police or investigators is … imputed to the prosecution under *Brady*."); *United States v. Sanchez*, 813 F.Supp. 241, 247-48 (S.D.N.Y. 1993) (citing *Butler* as a case where the court considered "nondisclosure and perjury … jointly under the rubric of 'prosecutorial misconduct.'").

Despite *Butler*'s emphasis on the scope of the **prosecutor's** duties and imputed knowledge, the Panel characterized *Butler* as having "made unmistakably clear that police officers and prosecutors alike share an obligation to disclose 'pertinent material evidence favorable to the defense.'" *Carrillo*, 2015 WL 5024010, at *8 (quoting *Butler*, 567 F.3d at 888). The Panel also emphasized that *Butler* placed "police officers on notice that their failure to disclose *Brady* information would constitute a violation [of] the defendant's constitutional rights." *Carrillo*, 2015 WL

5024010, at *8. The Panel, therefore, concluded that "*Butler* clearly established in 1978 that police officers have a duty to disclose *Brady* material." *Id.*

**B.     The Panel Decision Cannot Be Reconciled With The Fact That This Specific Constitutional Question Was Not Rendered Beyond Debate Until 2009.**

The Panel's conclusions about the constitutional ramifications of *Butler* cannot be reconciled with *Butler* itself, and the treatment of *Butler* by judges throughout this Circuit since 1978. Indeed, during the 37 years between *Butler* and the Panel Decision, this Circuit has never characterized *Butler* as having placed police officers on notice that they had the same disclosure obligations as do prosecutors under *Brady*. Had *Butler* in fact made such a clear pronouncement of constitutional law, *Butler* would undoubtedly have been consistently (or at least occasionally) cited in subsequent cases where police officers were alleged to have violated *Brady*. On the contrary, prior to the Panel Decision, *Butler* has never been cited by this Circuit for this fundamental constitutional proposition.

In fact, *Butler* was not cited or discussed in *Tennison v. City and County of San Francisco*, 570 F.3d 1078 (9th Cir. 2009), in which this Court

specifically addressed the issue of "Duty of Police Officers versus Prosecutors" as the defendants argued that "*Brady* imposes a duty on prosecutors, but not on police officers, to disclose exculpatory evidence." *Id.* at 1087. Had *Butler* already rendered this constitutional question "beyond debate" in 1978, this particular *Brady* analysis would have been entirely unnecessary. Instead, this Court cited *United States v. Blanco*, 392 F.3d 382 (9th Cir. 2004), a 2001 Seventh Circuit case, and two Supreme Court cases from 1995 and 2006, in holding that *Brady* imposes a duty on police officers to disclose exculpatory evidence. *Tennison*, 570 F.3d at 1087. *Tennison* further held that the right of a criminal defendant to receive a Mirandized confession by someone "who had been named by a reliable witness, known to the officers, who recounted events surrounding the murder in detail, and whose account contradicted the prosecution's witnesses" was clearly established in 1990. *Id.* at 1095.

The Panel's treatment of *Butler* as the decision which placed this constitutional question beyond debate in 1978 simply cannot be reconciled with the analysis in *Tennison*. Moreover, since 2009, *Tennison* has been repeatedly recognized as the controlling decision by this Circuit on this constitutional question. For example, in *Gantt v. City of Los Angeles*, 717

F.3d 702 (9th Cir. 2013), this Court explained that *Brady*'s disclosure requirements were held "in no uncertain terms" to apply equally to prosecutors and police officers in *Tennison*. *Id.* at 709. Conversely, prior to *Tennison*, this *Brady* rule necessarily could not have been established with certainty, and beyond debate, in this Circuit. In *Gantt*, no such acknowledgement was given to *Butler* because this fundamental *Brady* question was not directly addressed until *Tennison*. *See also*, *Smith v. Almada*, 640 F.3d 931, 939 (9th Cir. 2011) ("*Brady* requires both prosecutors and police investigators to disclose exculpatory evidence to criminal defendants.") (citing *Tennison*); *Martinez v. Palmer*, 2015 WL 5554147, at *5 (D. Nev. Sept. 21, 2015) ("The duty to disclose exculpatory evidence extends to prosecutors as well as police officers.") (citing *Tennison*); *Ross v. City of Oakland*, 2015 WL 4365309, at *11 (N.D. Cal. July 14, 2015) (police officers may be held liable for withholding evidence from prosecutors) (citing *Tennison*); *Gunter v. Meeks*, 2013 WL 5493270, at *4 (D. Nev. Sept. 30, 2013) ("The law in the Ninth Circuit is clear that *Brady*'s requirement to disclose exculpatory evidence applies equally to prosecutors and police officers.") (citing *Tennsion*); *Mazzetti v. Bellino*, 2014 WL 4186662, at *6 (E.D. Cal. Aug. 21, 2014) ("*Brady*'s requirement

to disclose material exculpatory and impeachment evidence to the defense applies equally to prosecutors and police officers.") (citing *Tennison* and *Gantt*).

Indeed, the analysis in *Tennison* simply would not make sense if *Butler* "unambiguously" held that police officers are "bound by *Brady*'s disclosure requirements." *Carrillo*, 2015 WL 5024010, at *10. The many decisions citing *Tennison* for this constitutional rule would also be rendered erroneous. The three decade gap between *Butler* and *Tennison*, and the numerous cases crediting *Tennison* for establishing this rule, cannot be reconciled with the Panel's conclusion that *Butler* clearly established this rule in 1978. Undoubtedly, the judges in the post-*Butler* cases had ample opportunity to examine the effect of *Butler* in this constitutional context. The fact that none of those decisions concluded that *Butler* clearly established that police officers are subject to the same *Brady* requirements as prosecutors cannot be ignored here — where the denial of qualified immunity was based exclusively on the conclusion that *Butler* clearly established this rule. This Circuit's decisions since 1978 irrefutably

demonstrate otherwise.[3]

Finally, police officers are not subject to the same standards as judges and attorneys in deciphering the legal effect of constitutional rulings. *Barts v. Joyner*, 865 F.2d 1187, 1193 (11th Cir. 1989) ("We cannot realistically expect that reasonable police officers know more than reasonable judges about the law."). If neither judges throughout this Circuit nor attorneys briefing the issue in *Tennison* and its progeny were aware of *Butler* (or otherwise did not believe that *Butler* had clearly established that the *Brady* requirements applicable to prosecutors also apply to police officers), it is inherently unfair to hold police officers to a higher standard. When measured against the limited judicial applications of *Butler*, and the manner in which this *Brady* issue was directly addressed in *Tennison*, the Panel's reliance on *Butler* imposes an unduly high burden on the police officer Defendants in the instant cases. The resulting denials of qualified immunity also undermines the important public policy of supporting qualified

---

[3] Not only was the *Tennison* Court either unaware of *Butler* or otherwise did not believe it had clearly established that the same *Brady* obligation applicable to prosecutors applied to police officers, the attorneys who briefed the issue were apparently unaware of *Butler* as well since none of the parties in *Tennison* cited to, let alone addressed, *Butler* in any brief or pleading filed with the Ninth Circuit or the District Court.

immunity by providing sufficient leeway to public officials for purported constitutional violations which were not clearly established, beyond debate, at the time of the underlying conduct.

The erroneous retroactive classification of *Butler* as this Circuit's seminal case on the relationship between *Brady* and police officers warrants rehearing, and rehearing *en banc*, of the Panel Decision.

**II. AT THE VERY MINIMUM, TO THE EXTENT PLAINTIFFS IN THE *O'CONNELL* CASE ASSERT THAT "IMPEACHMENT" TYPE EVIDENCE WAS NOT DISCLOSED, THE PANEL ERRED IN NOT APPLYING QUALIFIED IMMUNITY ON A LIMITED SCOPE.**

Notably, part of the evidence that was purportedly not disclosed in the *O'Connell* case constituted impeachment evidence regarding two witnesses who linked Plaintiff Frank O'Connell to the 1984 murder of Jay French. Specifically, Plaintiffs in *O'Connell* allege that impeachment evidence was not disclosed with respect to Daniel Druecker, the sole eyewitness to the underlying murder who testified at the underlying trial that he had "no doubt" that Mr. O'Connell was the murderer, and Maurice Soucy, the witness who connected Mr. O'Connell to the yellow Pinto getaway vehicle.

As noted in the Panel's decision, "[t]he court [which granted Plaintiff's *habeas* petition] concluded O'Connell's conviction was based 'in large part on the eyewitness testimony identifying [him],' and that the officers' notes regarding Druecker's and Soucy's testimony **could have impeached their credibility**." *Carrillo*, 2015 WL 5024010, at *3.

At the time of the underlying 1984 investigation, however, the law was not clearly established, even for prosecutors, that "impeachment" evidence was subject to the *Brady* disclosure requirements. For this additional reason, since it was not clearly established that the subject impeachment materials regarding witnesses Druecker and Soucy fell within the requirements of *Brady,* qualified immunity should be applied to Detectives J.D. Smith and Gilbert Parra (deceased) on this alternate limited basis.

As set forth in Section I, *infra,* qualified immunity shields public employees from liability under Section 1983 unless they violate a statutory or constitutional right clearly established **at the time of the challenged conduct**. *City & Cnty. Of San Francisco v. Sheehan*, *supra,* 135 S. Ct. at 1774. "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable

official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate." *Sheehan*, 135 S.Ct. at 1774. Yet, by not considering the fact that part of the "*Brady*" evidence in the *O'Connell* case was "impeachment" type evidence and simply making the broad conclusion that it was clearly established in 1984 that *Brady* applied to police officers (without taking into account the specific type of evidence that purportedly was not disclosed), the Panel in the instant case did precisely what the Supreme Court has repeatedly emphasized should not be done.

A.  **Prior to the Underlying 1984 Investigation in *O'Connell*, Courts Had Distinguished "Impeachment" Evidence From "Exculpatory" Evidence For Purposes of the Disclosure Requirements Under *Brady*.**

Prior to the underlying 1984 investigation, courts made a distinction between "impeachment" evidence and otherwise "exculpatory" evidence for purposes of the *Brady* disclosure requirements. This distinction dates back to *Brady* which, by its own terms, defined "exculpatory" evidence as encompassing only evidence "material either to guilt or to punishment". *Brady,* 373 U.S. at 87. In contrast, *Brady* made no mention of a disclosure

requirement for evidence that might be used solely for purposes of impeachment.

Subsequent rulings carried on this distinction. This view clearly endured throughout the 1970s, demonstrated by the finding in *U.S. v. Mackey*, 571 F.2d 376 (7th Cir. 1978) that the suppression of evidence "which was merely additional material for impeaching" was not a *Brady* violation. In the 1980s, courts continued to maintain that evidence "did not rise to the level of *Brady* material for it was not evidence of innocence but at most was merely additional impeachment material." *See, e.g., U.S. v. Gantt*, 617 F.2d 831, 843, n. 4 (D.C. Cir. 1980).

In fact, just two years before the underlying 1984 investigation, a California court found that "as a general rule, evidence **which merely impeaches a witness** is not significant enough to make a different result probable." *People v. Green*, 130 Cal.App. 3d 1, 11 (Cal. Ct. App. 1982) (emphasis added). Even into 1985, a federal judge noted "the Supreme Court has never held whether *Brady* and *Agurs* apply to evidence admissible only for impeachment purposes." *Walker v. Lockhart*, 763 F.2d 942, 966, n. 6 (8th Cir. 1985) (Gibson, J., dissenting).

It was not until July, 1985 that the Supreme Court granted certiorari on the issue to clarify that there is no difference between "exculpatory" and "impeachment" evidence for purposes of *Brady*. *U.S. v. Bagley*, 473 U.S. 667, 676 (1985). However, that decision came only after a district court within this Circuit's jurisdiction had held that suppression of mere impeachment evidence did not violate *Brady*. *Bagley v. Lumpkin*, 719 F. 2d 1462, 1464 (9th Cir. 1983). Indeed, the fact that the Supreme Court found it necessary to address the issue in 1985 is evidence itself that the law was not clearly established prior to 1985 that "impeachment" evidence fell within the contours of *Brady*.

If, prior to 1985, it was not clearly established to prosecutors as well as judges (including within this Circuit's jurisdiction) that "impeachment" evidence fell within the *Brady* disclosure requirements, how could the same concept have been clearly established as to police officers where, as set forth above, circuits were divided as to whether *Brady* obligations applied at all to police officers? At the very least, the existing precedent at the time of the underlying 1984 investigation did not place the constitutional question (that impeachment evidence fell within the scope of *Brady*) "beyond debate", as required by *Sheehan.*

**B.**     **Long After the Underlying 1984 Investigation, Courts**
          **Continued to Debate Whether "Impeachment" Evidence**
          **Falls Within the Parameters of *Brady*.**

In the decades following the underlying 1984 investigation, courts confirmed that it was not clearly established in 1984 that *Brady* required the disclosure of impeachment evidence.  In fact, as recently as 2013, the Chief Justice of the First Circuit declared that "it certainly was not clearly established in 1989 that a police officer . . . had an affirmative obligation under *Brady* to disclose potential impeachment evidence."  *Drumgold v. Callahan*, 707 F.3d 28, 57 (1st Cir. 2013) (Lynch, C.J., dissenting).  If this obligation was not clearly established by 1989, it definitely was not clearly established at the time of the 1984 investigation.[4]

Other courts have gone into more detail on the issue.  *See, e.g., Reid v. Simmons*, 163 F.Supp.2d 81 (D. N.H. 2001), *aff'd,* 47 Fed.Appx. 5 (1st Cir. 2002) (per curiam).  In *Reid*, the court summarized the issue as follows:  "If the relevant inquiry is defined as whether, in 1987, it was clearly established that police officers had a constitutionally mandated obligation to turn over

_____

[4] Notably, Judge Lynch went a step further and suggested that it was not even clearly established as of 2013 that police officers had **any** obligations under *Brady*.  *Drumgold*, 707 F.3d at 57.

reports or other evidence that is not, on its face, patently 'exculpatory,' but which . . . might nevertheless prove effective for **impeachment** purposes, one would be hard-pressed to answer in the affirmative." *Id.* at 95 (emphasis added). *Reid* clarified that, "it was **not clearly established in 1987 that a police officer's failure to disclose potentially, though not obviously, exculpatory impeachment material** . . . would constitute a discrete and actionable violation of the defendant's constitutional right to due process." *Id.* at 96-97 (emphasis added). *Reid* expounded on its reasoning, providing that even if "by 1987, **some** courts had established the rule, . . . the announcement of that rule establishing the right was not so unambiguous and widespread that the unlawfulness . . . would have been apparent to any reasonable police officer." *Id.* at 95 (emphasis in original).

   More recently, in 2009, *Haley v. City of Boston*, 677 F.Supp.2d 379 (D. Mass. 2009) addressed the issue as to whether it was clearly established that "impeachment" evidence fell within the scope of *Brady* prior to the 1985 Supreme Court's decision in *Bagley*. Like Plaintiffs in the instant case, the plaintiff in *Haley* argued that the Supreme Court implied in *Giglio v. United States,* 405 U.S. 150 (1972) that "impeachment" evidence was within the scope of *Brady*. *Id.* at 390. *Haley,* however, rejected this argument and

held that the "principle [that "impeachment" evidence fell within the scope of *Brady*] was not made explicit until years later in *Bagley*." *Id.* at 391.[5] As noted above, the *Bagley* case was not published until **after** the underlying investigation in the *O'Connell* case.

*Haley* emphasized that *Giglio* only made an "oblique allusion to the impeachment of a witness's credibility." *Id.* The court then elaborated on the Supreme Court's decisions, asserting that "had it been 'clearly established' in *Giglio* that the *Brady* exculpatory obligation extended to [impeachment evidence], it would not have been necessary for the Court to expand on the issue in *Bagley*." *Id.* Hence, the right could not have been clearly established during the pre-*Bagley* investigation of O'Connell.

These contemporary rulings illuminate the fact that it was not clearly established to prosecutors (much less police officers) that "impeachment" evidence fell within the *Brady* parameters prior to the underlying 1984 investigation. Therefore, at the very minimum, the Panel erred in not

---

[5] *Haley* was reversed in part in *Haley v. City of Boston*, 657 F.3d 39 (1st Cir. 2011) to the extent that there were allegations of **deliberate** suppression of evidence. With respect to the holding that there was no clearly established law that "impeachment" evidence fell within the scope of *Brady*, the First Circuit actually expanded its holding to apply to any evidence as long as it was not deliberately suppressed.

applying qualified immunity to the individual Defendants (Detectives Smith and Parra (deceased)) in the *O'Connell* case with respect to the "impeachment" evidence regarding witnesses Druecker and Soucey.

## III.  <u>CONCLUSION</u>.

For the foregoing reasons, Defendants/Appellants respectfully request rehearing by the Panel, or alternatively, rehearing *en banc*, of the August 26, 2015 Panel Decision.

Dated:  September 30, 2015         LAWRENCE BEACH ALLEN & CHOI

By___/s/ *Jin S. Choi*_____
        Jin S. Choi
Attorneys for Defendants-Appellants
COUNTY OF LOS ANGELES and
CRAIG DITSCH

Dated:  September 30, 2015         LAWRENCE BEACH ALLEN & CHOI

By___/s/ *Michael D. Allen*_____
        Michael D. Allen
Attorneys for Defendants-Appellants
J. D. SMITH and ERIC PARRA

# CERTIFICATE OF COMPLIANCE

Pursuant to Ninth Circuit Rule 40-1, I certify that the Petition for Rehearing and Suggestion for Rehearing *En Banc* is double spaced, proportionately space (Times New Roman), has a typeface of 14 points and contains approximately 4,179 words.


Dated:  September 30, 2015        LAWRENCE BEACH ALLEN & CHOI


                                  By____/s/ *Jin S. Choi*_____
                                          Jin S. Choi
                                  Attorneys for Defendants-Appellants
                                  COUNTY OF LOS ANGELES and
                                  CRAIG DITSCH


Dated:  September 30, 2015        LAWRENCE BEACH ALLEN & CHOI


                                  By____/s/ *Michael D. Allen*_____
                                          Michael D. Allen
                                  Attorneys for Defendants-Appellants
                                  J. D. SMITH and ERIC PARRA

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 30, 2015, I electronically filed the

foregoing **PETITION FOR REHEARING AND SUGGESTION FOR**

**REHEARING *EN BANC*** with the Clerk of the Court for the United States

Court of Appeals for the Ninth Circuit by using the appellate CM/ECF

system.

Participants in the case who are registered CM/ECF users will be

served by the appellate CM/ECF system.


Dated:  September 30, 2015        LAWRENCE BEACH ALLEN & CHOI


                                        By    /s/ *Jin S. Choi*
                                             Jin S. Choi
                                        Attorneys for Defendants-Appellants
                                        COUNTY OF LOS ANGELES and
                                        CRAIG DITSCH

2015 WL 5024010
United States Court of Appeals,
Ninth Circuit.

Francisco CARRILLO, Jr., Plaintiff–Appellee,
v.
COUNTY OF LOS ANGELES; Craig
Ditsch, Defendants–Appellants.
Frank O'Connell; Nicholas
O'Connell, Plaintiffs–Appellees,
v.
J.D. Smith; Eric Parra; County of Los
Angeles, Defendants–Appellants.

Nos. 12–57229, 13–56817. | Argued
and Submitted June 4, 2015—Pasadena,
California.[*] | Filed Aug. 26, 2015.

**Synopsis**
**Background:** Individuals who had been wrongly convicted brought separate § 1983 actions against the police investigators involved in their respective cases, arguing in part that officers failed to disclose evidence that would have cast serious doubt on the testimony of key prosecution witnesses. Officers asserted qualified immunity. The Appeal from the United States District Court for the Central District of California, Stephen V. Wilson, J., and Michael W. Fitzgerald, J., denied officers' claims for qualified immunity. Officers appealed.

**Holdings:** Cases were consolidated for disposition and the Court of Appeals, Fisher, Circuit Judge, held that:

[1] due process right to disclosure of material and exculpatory evidence was clearly established at time of plaintiffs' criminal trials, and

[2] any reasonable officer would have understood that *Brady* required the disclosure of the evidence allegedly withheld.

Affirmed.

West Headnotes (14)

**[1]** **Federal Courts**
 Immunity

A district court's denial of summary judgment on the basis of qualified immunity is reviewed de novo.

Cases that cite this headnote

**[2]** **Federal Courts**
 Immunity

Denial of a motion for judgment on the pleadings based on qualified immunity is reviewed de novo.

Cases that cite this headnote

**[3]** **Civil Rights**
 Sheriffs, police, and other peace officers

Qualified immunity shields police officers from liability under § 1983 unless they have violated a statutory or constitutional right clearly established at the time of the challenged conduct. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[4]** **Civil Rights**
 Government Agencies and Officers
**Civil Rights**
 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

To determine whether an officer is entitled to qualified immunity, courts conduct a two-part test, asking, first, whether the facts plaintiff alleges show a violation of a constitutional right, and, second, whether the right was clearly established at the time of the alleged misconduct.

Cases that cite this headnote

**[5]** **Civil Rights**
 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

An officer cannot be said to have violated a clearly established right, for purpose of determining whether officer is entitled to qualified immunity in a § 1983 action, unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[6]** **Civil Rights**
    👉 Sheriffs, police, and other peace officers

Plaintiff's due process right to disclosure of material and exculpatory evidence was clearly established at time of his criminal trial, for purposes of police officers' claim of qualified immunity against plaintiff's § 1983 claim based on *Brady* violation, where circuit case law existing at time of plaintiff's criminal trial made unmistakably clear that police officers and prosecutors alike shared an obligation to disclose pertinent material evidence favorable to the defense. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[7]** **Constitutional Law**
    👉 Evidence

A criminal defendant is equally deprived of his or her due process rights when the police, rather than the prosecutor, suppresses exculpatory evidence because, in either case, the impact on the fundamental fairness of the defendant's trial is the same. U.S.C.A. Const.Amend. 14.

Cases that cite this headnote

**[8]** **Civil Rights**
    👉 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Although disagreement among circuit courts may imply that a legal principle is not "beyond debate," and thus not clearly established, qualified immunity is not the guaranteed product

of disuniform views of the law in the other federal, or state, courts, and the fact that a single judge, or even a group of judges, disagrees about the contours of a right does not automatically render the law unclear.

Cases that cite this headnote

**[9]** **Federal Courts**
    👉 In general; necessity

Absent exceptional circumstances, Court of Appeals generally will not consider arguments raised for the first time on appeal, although it has discretion to do so.

Cases that cite this headnote

**[10]** **Federal Courts**
    👉 Specification of errors; points and arguments

Court of Appeals normally declines to address an issue that is simply mentioned on appeal, but not argued.

Cases that cite this headnote

**[11]** **Civil Rights**
    👉 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

For a legal principle to be clearly established, for purpose of determining whether an officer is entitled to qualified immunity, it is not necessary that the very action in question has previously been held unlawful, but rather that in the light of pre-existing law the unlawfulness is apparent; in other words, the contours of the right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.

Cases that cite this headnote

**[12]** **Civil Rights**
    👉 Sheriffs, police, and other peace officers

Any reasonable officer would have understood that *Brady* required the disclosure of evidence impeaching eyewitnesses' identification of criminal defendant as shooter in murder trial, and

thus police officers were not entitled to qualified immunity from criminal defendant's § 1983 claim alleging failure to disclose exculpatory evidence; it was clearly established, at time of trial, that credibility of government witnesses fell within *Brady* 's ambit. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[13]** **Civil Rights**
👉 Sheriffs, police, and other peace officers

Any reasonable officer would have understood that *Brady* required the disclosure of evidence of a previous attempt on murder victim's life by an individual who resembled eyewitnesses' description of shooter, and thus police officers were not entitled to qualified immunity from criminal defendant's § 1983 claim alleging failure to disclose exculpatory evidence. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[14]** **Civil Rights**
👉 Sheriffs, police, and other peace officers

Any reasonable officer would have understood that *Brady* required the disclosure of evidence that eyewitness to murder had initially chosen several other photos before ultimately selecting criminal defendant's photo, and evidence that officer threatened eyewitness upon learning of eyewitness's recantation of identification, and thus police officers were not entitled to qualified immunity from criminal defendant's § 1983 claim alleging failure to disclose exculpatory evidence; it was clearly established, at time of trial, that credibility of government witnesses fell within *Brady* 's ambit. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Paul B. Beach, Michael D. Allen (argued), George E. Morris Jr., Lawrence Beach Allen & Choi, PC, Glendale, CA, for Defendants–Appellants J.D. Smith and Eric Parra.

David D. Lawrence, Jin S. Choi (argued), Lawrence Beach Allen & Choi, PC, Glendale, CA, for Defendant–Appellant Craig Ditsch.

Barrett S. Litt (argued), Lindsay B. Battles, Kaye, McLane, Bednarski & Litt, LLP, Pasadena, CA, for Plaintiffs–Appellees Frank and Nicholas O'Connell.

Ronald O. Kaye, Marilyn E. Bednarski, Caitlin S. Weisberg, Barrett S. Litt (argued), Kaye, McLane, Bednarski & Litt, LLP, Pasadena, CA, for Plaintiff–Appellee Francisco Carrillo, Jr.

Appeal from the United States District Court for the Central District of California, Stephen V. Wilson, District Judge, Presiding. D.C. No. 2:11–cv–10310–SVW–AGR.
Appeal from the United States District Court for the Central District of California, Michael W. Fitzgerald, District Judge, Presiding. D.C. No. 2:13–cv–01905–MWF–PJW.

Before: RAYMOND C. FISHER, JAY S. BYBEE and CARLOS T. BEA, Circuit Judges.

**OPINION**

FISHER, Circuit Judge:

**\*1** Frank O'Connell and Francisco Carrillo were wrongfully imprisoned for decades before eventually securing habeas relief. After release, they separately brought suit under 42 U.S.C. § 1983 in federal district court against the police investigators involved in their respective cases, arguing in part the officers failed to disclose evidence that would have cast serious doubt on the testimony of key prosecution witnesses.[1] The defendant officers asserted qualified immunity, arguing the law at the time of the investigations did not clearly establish the duty of police officers to disclose material, exculpatory evidence under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The district court denied judgment on the pleadings in O'Connell's case and summary judgment in Carrillo's case, concluding the officers' duty to disclose *Brady* evidence was clearly established at the time of the investigations. The officers challenge these determinations on appeal.[2]

We conclude, first, that the law at the time of the investigations clearly established that police officers had to

**Exhibit "1"**

disclose material, exculpatory evidence under *Brady,* and second, that any reasonable officer would have understood that *Brady* required the disclosure of the specific evidence allegedly withheld. We therefore affirm the denials of qualified immunity and remand these cases to the district court for further proceedings.

## BACKGROUND [3]

### I. O'Connell

In January 1984, Jay French was murdered in the parking lot of his apartment building. Los Angeles County Sheriff's Department (LASD) homicide detectives J.D. Smith and Gilbert Parra were responsible for investigating the murder. Smith and Parra discovered French was in a heated battle over the custody of his children with his ex-wife, Jeanne Lyon, and that Lyon had called French's home on the morning of the murder. During their investigation, the officers discovered Lyon had been romantically involved with Frank O'Connell the previous summer. The eyewitness descriptions of the killer matched O'Connell, and he was ultimately charged with French's murder. The case proceeded to a bench trial.

At trial, the prosecution introduced evidence that French had shouted, as he lay dying, that "that fucker in the yellow Pinto shot me," and that "he was going to have to die and it had something to do with Jeanne [Lyon], it looked like somebody she hangs around with or somebody she hung around with." [4] Through the testimony of several witnesses, including Daniel Druecker, Alec Sanchez, Arturo Villareal and Maurice Soucy, the prosecution pinned the crime to O'Connell.

Druecker, who lived in French's apartment building, was the only witness to the shooting itself. At trial, he described the shooter as a tall Caucasian man in his thirties with brown shoulder-length hair. He identified O'Connell as the killer at trial and testified he had selected O'Connell from a photo lineup shown to him by the officers.

 **\*2** Sanchez, a flagman in the area, reported and later testified he had witnessed a yellow Pinto station wagon with faded wooden sides fleeing the scene of the crime. He described the driver as a woman with blond hair and her companion as a white male with long curly brown hair. He was unable to identify O'Connell or anyone else as the passenger in the car.

Villareal, a deliveryman, also saw the shooter leave the scene of the crime in a Pinto. He testified that, when the investigators showed him a photo lineup, he selected two photos and told the officers he "couldn't be positive" which was the shooter. He also testified he could not identify O'Connell as the person he saw the day of the murder. Detective Smith countered this testimony, testifying Villareal had chosen only one photo from the lineup. He read from a police report that represented Villareal as remarking that O'Connell was "the strongest contender, and I'm sure that's him."

Finally, Soucy, a neighbor of Lyon's, testified. Soucy recalled seeing a tall white man who drove a yellow Pinto in his apartment complex on several occasions. Soucy further testified he had seen the man who drove the Pinto kissing Lyon, and that he had seen the car parked near Lyon's apartment on several occasions. He identified O'Connell in court as the man he had seen driving the Pinto.

O'Connell was convicted of murder following his bench trial. Over 20 years later, he filed a state habeas petition, alleging in part that the investigating officers failed to disclose material, exculpatory evidence that would have undermined the witnesses' trial testimony and cast suspicion on an alternative suspect.

At an evidentiary hearing on O'Connell's habeas petition, Druecker testified, offering information that would have significantly undercut his identification of O'Connell at trial. He recalled he had been working on his car on the day French was shot and was not wearing contacts or glasses, which he generally needed because he was nearsighted. He was leaning into the driver's side of his car when he heard a loud "pop," which he thought was a firecracker. He got out of the car to see French running and screaming that he had been shot. A man immediately behind French stopped, raised a gun and pointed it, when Druecker heard another bang. Druecker ducked behind a car. As a result, he saw the shooter only in left profile and described him as tall, with long, dark hair and carrying a long-barreled gun. Because Druecker had never seen a gun, he was focused on the weapon.

An officer on the scene asked whether Druecker had seen anything. Druecker said he thought he could identify the shooter but was not certain. Two officers (later identified as Smith and Parra) came to Druecker's apartment to ask for a description of the shooter. Druecker told them he could not remember what the shooter looked like and asked if the

Exhibit "1"

officers could put him under hypnosis, which they refused to do. He testified the officers "kept calling him," and eventually came back on their own one morning with photos of six men. Druecker took this as an indication that they must have found the shooter. He told the officers he had seen only the shooter's profile and asked if they had profile photos. He also remarked to them that every photo depicted a man with a mustache but that he did not remember the shooter having a mustache.

 **\*3**  Even though Druecker told the officers he did not recognize any of the men depicted in the photos, they told him to "really look" at the photos. Feeling he had to select one of the photos, and believing the officers already knew who the shooter was, he pointed to photo three (which depicted O'Connell) and asked, "Is this the guy?" The officers asked if this was the person he was identifying as the shooter. Thinking the officers already knew who the shooter was, Druecker responded, "I think that's the guy." The officers told him he had to be certain. He said he was sure, but at the evidentiary hearing on O'Connell's habeas petition, he testified that he only did so out of intimidation. In truth, he did not recognize the photo but was simply guessing. Druecker explained he did not disclose this uncertainty either during the preliminary hearing or at trial because he was afraid and believed, based on his interactions with the officers, that he had identified the correct person.

During the habeas proceeding, O'Connell discovered a copy of the officers' handwritten notes detailing their interview with Maurice Soucy. In the official police report, which was disclosed, the officers had written that when shown the photo lineup, Soucy "immediately pointed out photograph number three. He stated that was the person who asked him to jump start the yellow Pinto, and was also the same person he had seen hugging and kissing Jeanne Lyon."But in the handwritten notes, which were never provided to the prosecutors or the defense, the officers had written that Soucy identified "# 3 & poss. # 1" and "picked out # 3 as poss. suspect because of face but hair was curlier." [5] Immediately following that statement, they noted the name "Maurice." [6] These notes were never turned over to the prosecution or defense.

O'Connell also discovered another set of handwritten notes revealing a possible alternative suspect to the crime. The prosecution contended French's dying declaration, in which he shouted the killer was someone Jeanne "hung around with," pointed solely to O'Connell, who had been romantically linked to Lyon. But other notes taken by the

officers during an interview with a former attorney of French's revealed Lyon, along with another man, had previously made an attempt on French's life. In one note, the officers wrote that French's "x wife attempted to run over v [victim] while trying to serve her papers for child custody. Jeannie [Lyon] was pres. in her Capri car (green). Another guy was driving.... Randy Smith driver of car."In another note, the officers wrote that "Jeanne and a man named 'Randy' were waiting at the road where v would be riding. Randy was driving a green Capri registered to Jeanne Marie Hernandez. Randy attempted to run v down.... Randy Smith is tall with sandy or blond hair."Neither of these notes was turned over to the prosecutors or to the defense.

Based on Druecker's testimony and these undisclosed notes, a California superior court granted O'Connell's habeas petition in 2009. The court concluded O'Connell's conviction was based "in large part on the eyewitness testimony identifying [him]," and that the officers' notes regarding Druecker's and Soucy's testimony could have impeached their credibility. The court determined the conviction was further undermined by the previously undisclosed evidence that French's dying declaration could have referred to Randy Smith rather than O'Connell. The district attorney's office declined to re-prosecute O'Connell, and in June 2012, all charges against him were dismissed.

 **\*4**  After his habeas petition was granted, O'Connell filed suit under 42 U.S.C. § 1983, alleging in part that the officers violated his right to due process by withholding material, exculpatory evidence and that as a result, he was wrongfully convicted. Specifically, he alleged the officers failed to disclose evidence regarding Druecker's uncertainty in identifying O'Connell and the officers' insistence he select a photo from the lineup; notes revealing that Soucy initially chose multiple photos from the lineup and was uncertain of his identification; and information about a potential alternative suspect. He also alleged the police officers withheld evidence that Villareal had selected two photos from the lineup, and that the representation in the official police report that he had selected just one photo was false.

The officers filed a motion for judgment on the pleadings based on qualified immunity, arguing it was not clearly established in 1984 that they were bound by *Brady*'s disclosure requirements. The district court denied their motion, and this appeal followed.

**Exhibit "1"**

## II. Carrillo

On a January night in 1991, Donald Sarpy was killed in a drive-by shooting in Lynwood, California. Sarpy had been walking towards a group of six young black teenagers, one of whom was his son. The area was home to two rival gangs, including a Hispanic gang, "Young Crowd," and an African–American gang, "N–Hood." When interviewed by LASD deputies shortly after the shooting, two of the teenagers recalled hearing someone in the suspect vehicle shout "fuck N–Hood," and another reported hearing someone shout "Young Crowd Locos." Aside from recalling the people in the car were male, Hispanic teenagers, the witnesses were unable to provide any additional identification information. The deputies' report of their initial conversations with the witnesses noted there were no "unique suspect identifiers" and only a "general suspect description."

A few hours later, at 1:00 a.m., the deputies brought five of the witnesses to the sheriff's station in Lynwood for questioning. The witnesses were interviewed separately. The final witness to be interviewed was a 16–year–old boy named Scott Turner. Unlike the other witnesses, Turner was interviewed by defendant Craig Ditsch, a LASD deputy and member of Operation Safe Streets, the sheriff's gang enforcement unit. Ditsch knew Turner from previous gang-related cases. Also unlike the other witnesses, Turner was shown photographs of several suspects. First, he was shown a "gang book," containing 140 photographs of Latino teenagers believed to be members of the Young Crowd gang. Turner randomly selected several photos from the gang book, but each time, Ditsch told him his selection "could not be the suspect." Finally, Turner selected Carrillo's photo, and Ditsch responded that Turner had made the "right choice." During Carrillo's habeas proceeding, Turner testified as follows:

> They opened the book, and they had books of pictures of people, and they was like, "Well, what about this guy?" You know, I'm like—you know, well, the first person that I picked, I was like, "Him." And they was like, "No, it couldn't be him. He's locked up." And I'm like, "Okay, you know. Well, what about him?" "Well, no. It couldn't be him." A couple more pages. I got to the similar description, you know, similar to Frank [Carrillo], and I was like, "Well, him." He looks close, you know. "Well, yeah, you know, it could be him. He's a new member, you know. He's trying to earn his bones, you know. He's fresh on, so he's got to get his respects, so it could be him. He's a young guy, you know, he's coming up." "Yeah. Yeah. You know, yeah, could be him. Matter of fact, it is him."

*5 Ditsch next showed Turner a photo lineup with Carrillo's photo in position number 1. Turner selected Carrillo's photo.[7] In a police report, Ditsch wrote that Turner had selected Carrillo's photo but did not mention Turner had selected several photos of other individuals first, or that Ditsch confirmed Turner's choice when Turner ultimately selected Carrillo's photo. Turner then told the other eyewitnesses he had chosen the first photo in the lineup. The other eyewitnesses, who were only shown the photo lineup six months after Carrillo's arrest, chose Carrillo as the perpetrator based on Turner's identification.

All six eyewitnesses testified for the prosecution at Carrillo's first trial, which ended in deadlock. Before the second trial, Turner, who was now in county jail, recanted, saying his identification had been a mistake and that he could no longer testify against Carrillo.[8] Ditsch met with Turner in jail and threatened that Turner would face negative consequences once he was back out on the streets if he recanted.

Turner nevertheless testified for the defense at Carrillo's second trial that his identification of Carrillo was mistaken. He did not, however, disclose that Ditsch had suggested to him that Carrillo was the shooter. Ditsch testified for the prosecution that Turner had selected Carrillo from the gang books by "put [ting] his finger on the picture [of Carrillo] and sa[ying], 'That's the guy.' " He also denied that Turner selected anybody else before settling on Carrillo. In his capacity as a gang expert, Ditsch testified that witnesses who are incarcerated often recant because of their fear of being perceived as "snitches," and that Turner had "do[ne] a complete turnaround in this case" after being sent to jail. Although Turner recanted, the other witnesses maintained their identifications. The jury convicted Carrillo.

Nearly 20 years later, Carrillo filed a habeas petition in California superior court, alleging the eyewitness testimony implicating him was false and that someone else had committed the shooting. During a hearing on the petition, five of the six eyewitnesses who had testified at his second trial recanted their original identification, admitting they could not see who shot Sarpy. The court granted the petition, concluding Carrillo "ha[d] established that the eyewitness evidence against him was either false, tainted, or both." The district attorney's office did not appeal the ruling or retry Carrillo.

**Exhibit "1"**

Following the grant of his habeas petition in state court, Carrillo filed suit under 42 U.S.C. § 1983, alleging in part that Ditsch violated his right to have material and exculpatory evidence disclosed under *Brady,* and that, as a result, he was wrongfully convicted. Specifically, he alleges Ditsch failed to disclose his "role in providing information to Scott Turner that steered him towards his identification of ... Carrillo."

Ditsch moved for summary judgment, arguing he was entitled to qualified immunity on Carrillo's *Brady* claim because it was not clearly established in 1991 that *Brady* applied to police officers as well as prosecutors. The district court denied his motion, and Ditsch appealed. [9]

### STANDARD OF REVIEW

**\*6** **[1]** **[2]** A district court's denial of summary judgment on the basis of qualified immunity is reviewed de novo. *See Wilkins v. City of Oakland,* 350 F.3d 949, 954 (9th Cir.2003). Similarly, the denial of a motion for judgment on the pleadings based on qualified immunity is reviewed de novo. *See Somers v. Thurman,* 109 F.3d 614, 616 (9th Cir.1997). "Where disputed issues of material fact exist, we assume the version of the material facts asserted by the non-moving party." *Mattos,* 661 F.3d at 439. "We draw all reasonable inferences in favor of the non-moving party." *Id.*

### DISCUSSION

In this appeal, we consider whether the police officers in these two cases were entitled to qualified immunity for their alleged failure to disclose material and exculpatory evidence as required by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**[3]** **[4]** **[5]** Qualified immunity shields police officers from liability under 42 U.S.C. § 1983 unless they have violated a statutory or constitutional right clearly established at the time of the challenged conduct. *See City & Cnty. of San Francisco v. Sheehan,* —— U.S. ——, 135 S.Ct. 1765, 1774, 191 L.Ed.2d 856 (2015). To determine whether an officer is entitled to qualified immunity, we conduct a two-part test. *See Pearson v. Callahan,* 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). First, do the facts the plaintiff alleges show a violation of a constitutional right? *See id.* Second, was the right "clearly established" at the time of the alleged misconduct? *See id.* "An officer cannot be said

to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate." *Sheehan,* 135 S.Ct. at 1774 (internal citations, alterations and quotation marks omitted).

The defendants do not dispute that the evidence allegedly withheld falls within *Brady's* scope, and we therefore do not address the first prong of the qualified immunity analysis. *See Tatum v. Moody,* 768 F.3d 806, 821 n. 10 (9th Cir.2014) (declining to address an element of qualified immunity defendants failed to argue). [10] Instead, we consider only the second prong: whether the officers would have understood they were violating the Supreme Court's 1963 decision in *Brady* by failing to disclose this evidence. We first address whether it was clearly established in 1984 that police officers as well as prosecutors were bound by *Brady* at all, [11] and next whether the evidence allegedly withheld in these cases was clearly established to be *Brady* evidence.

### I. The law in 1984 clearly established that police officers were bound to disclose material, exculpatory evidence.

**[6]** The officers argue the law did not clearly establish that they were bound by *Brady* at all in 1984 and 1991. This contention lacks merit because it was clearly established well before the events in these cases that police officers were bound to disclose material and exculpatory evidence.

**\*7** *Brady* held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. 1194. This holding was an "extension" of *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), which held the government's presentation of testimony it knew to be false, as well as its suppression of evidence that would have impeached that testimony, could require reversal of a conviction. *See Brady,* 373 U.S. at 86, 83 S.Ct. 1194. The Supreme Court reasoned:

> The principle of *Mooney v. Holohan* is *not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused.* Society wins not only when the guilty are convicted but when criminal trials are

**Exhibit "1"**

fair; our system for the administration of justice suffers when any accused is treated unfairly.

*Id.* at 87, 83 S.Ct. 1194 (emphasis added).*Brady* framed the right to material, exculpatory evidence in terms of the defendant rather than the state actor responsible for the nondisclosure. As the Court later explained, the "purpose" of *Brady*'s disclosure requirement is "to ensure that a miscarriage of justice does not occur."*United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

Just one year after *Brady,* the Fourth Circuit held police officers as well as prosecutors were bound to disclose material, exculpatory evidence, explaining:

> it makes no difference if the withholding is by officials other than the prosecutor. The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure.... The duty to disclose is that of the state, which ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused. We cannot condone the attempt to connect the defendant with the crime by questionable inferences which might be refuted by undisclosed and unproduced documents then in the hands of the police.

*Barbee v. Warden,* 331 F.2d 842, 846 (4th Cir.1964).

**[7]** Requiring police officers as well as prosecutors to disclose material and exculpatory evidence follows logically from *Brady's* rationale. "As far as the Constitution is concerned, a criminal defendant is equally deprived of his or her due process rights when the police rather than the prosecutor suppresses exculpatory evidence because, in either case, the impact on the fundamental fairness of the defendant's trial is the same."*Moldowan v. City of Warren,* 578 F.3d 351, 379 (6th Cir.2009). Because police officers play an essential role in forming the prosecution's case, limiting disclosure obligations to the prosecutor would

"undermine *Brady* by allowing the investigating agency to prevent production by keeping a report out of the prosecutor's hands."*United States v. Blanco,* 392 F.3d 382, 388 (9th Cir.2004) (quoting *United States v. Zuno–Arce,* 44 F.3d 1420, 1427 (9th Cir.1995)).

**\*8** This circuit adopted *Barbee*'s logic well before the investigations here. In *United States v. Butler,* 567 F.2d 885, 891 (9th Cir.1978), we rejected the government's argument that no *Brady* violation occurred because investigative agents, and not the prosecutor, were responsible for the nondisclosure of promises made to certain prosecution witnesses, explaining:

> [t]he prosecutor is responsible for the nondisclosure of assurances made to his principal witnesses even if such promises by other government agents were unknown to the prosecutor. *Since the investigative officers are part of the prosecution,* the taint on the trial is no less if they, rather than the prosecutor, were guilty of nondisclosure.

*Id.* (citing *Barbee,* 331 F.2d at 846) (emphasis added).*Butler* thus made unmistakably clear that police officers and prosecutors alike share an obligation to disclose "pertinent material evidence favorable to the defense."*Id.* at 888 (quoting *United States v. Gerard,* 491 F.2d 1300, 1302 (9th Cir.1974)).

The officers argue here that *Butler* did not clearly establish that officers are subject to *Brady* because it described the disclosure obligation in terms of the prosecutor rather than the police officer. But *Butler* undisputably put police officers on notice that their failure to disclose *Brady* information would constitute a violation the defendant's constitutional rights. It "taught police officers how to conform their conduct to the law," and "[a] police officer acting after the issuance of th[is] decision[ ] ... could not have thought that the suppression of material exculpatory evidence would pass constitutional muster."*Owens v. Baltimore City State's Attorneys Office,* 767 F.3d 379, 400 (4th Cir.2014) (explaining that, even though circuit cases including *Barbee* described the duty to disclose in terms of the prosecutor, they put officers on notice that withholding of *Brady* material would violate clearly established law). [12]

Because "clearly established law" includes "controlling authority in [the defendants'] jurisdiction," *Butler* clearly

**Exhibit "1"**

established in 1978 that police officers have a duty to disclose *Brady* material. *See Wilson v. Layne,* 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999); *Boyd v. Benton Cnty.,* 374 F.3d 773, 781 (9th Cir.2004) (explaining that sources of "clearly established law" include decisions of the Supreme Court or this circuit); *see also Hope v. Pelzer,* 536 U.S. 730, 741–45, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (holding defendants' conduct violated clearly established law in light of binding circuit precedent). [13]

The officers' attempts to circumvent *Butler* are unpersuasive. First, they incorrectly characterize *Butler*'s explanation of police officers' obligation under *Brady* as "dictum." It is not. The passage in that case discussing police officers' obligations under *Brady* was essential to the conclusion that a new trial was warranted when agents failed to disclose promises made to a key government witness, even though the prosecutors were unaware of the promises. *See Butler,* 567 F.2d at 891. Furthermore, we have relied on *Butler* to conclude in subsequent cases that *Brady* was violated when a police officer failed to disclose exculpatory evidence. *See, e.g., Jackson v. Brown,* 513 F.3d 1057, 1074 (9th Cir.2008) (relying in part on *Butler* to conclude that, in 1981, "the United States Constitution, as interpreted by *Brady* and *Giglio,* compelled prosecutors to disclose evidence favorable to the accused, even when that evidence was known only to the police and not to the prosecutor"); *United States v. Steel,* 759 F.2d 706, 714 (9th Cir.1985) ( "Because the government was required to furnish all exculpatory evidence under the doctrine of *Brady,* and because investigative officers are part of the prosecution, *Butler,* 567 F.2d at 891, there was indeed a negligent nondisclosure."(first internal citation omitted)).

**\*9** Second, the officers argue the law did not clearly establish they were bound by *Brady* until the Supreme Court itself "extended" *Brady* to police officers in *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).*Kyles* addressed a *Brady* violation in which police officers, unbeknownst to the prosecutor's office, failed to disclose material, exculpatory evidence. *See id.* at 421, 115 S.Ct. 1555. It concluded prosecutors were bound by a duty to learn of "any favorable evidence known to the others acting on the government's behalf in the case, including the police,"*id.* at 437, 115 S.Ct. 1555, and that "any argument for excusing a prosecutor from disclosing what he does not happen to know about boils down to a plea to substitute the police for the prosecutor, and even for the courts themselves, as the final arbiters of the government's obligation to ensure fair trials,"*id.* at 438, 115 S.Ct. 1555. Because *Kyles* was

decided in 1995, the defendants argue, it could not have been clearly established in 1984 or in 1991 that they were bound to disclose *Brady* evidence.

But *Kyles* did not announce a new principle of law. In fact, *Kyles* itself *rejected* the state's argument that "it should not be held accountable under *Bagley* and *Brady* for evidence known only to police investigators and not to the prosecutor," explaining that "[t]o accommodate the State in this matter would ... amount to a *serious change of course* from the *Brady* line of cases."*Id.* (emphasis added).

In the habeas context, we rejected an argument that *Kyles'* extension of *Brady* to police officers announced a "new rule" of criminal procedure, concluding "the principle underlying [*Kyles* '] unexceptional holding dates back, *at the latest,* to the Supreme Court's decision in *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)." *Jackson,* 513 F.3d at 1073 (emphasis added). In *Giglio,* the Supreme Court held *Brady* error occurred when one prosecutor had promised a key witness immunity, even though other prosecutors were unaware of the agreement, because "[t]he prosecutor's office is an entity and as such it is the spokesman for the Government," and therefore, "[a] promise made by one attorney must be attributed ... to the Government." *Giglio,* 405 U.S. at 154, 92 S.Ct. 763. Because "the responsibility of the prosecutor to investigate all promises made on behalf of the government extends to promises made by the police, who also make any such promises as spokespersons of the government, and for whom the prosecutor bears responsibility," we reasoned *Kyles* simply applied *Giglio.Jackson,* 513 F.3d at 1073.

Furthermore, the vast majority of circuits to have considered the question have adopted the view that police officers were bound by *Brady* well before the Court decided *Kyles.* [14] The Third Circuit alone has disagreed, concluding such an obligation was not clearly established until "the Supreme Court ... settle[d] this matter" in *Kyles,* notwithstanding precedent in that circuit that a police officer's failure to disclose *Brady* evidence could be imputed to the prosecutor. *See Gibson v. Super., N.J. Dept. of Law & Pub. Safety,* 411 F.3d 427, 443–44 (3d Cir.2005), *overruled on other grounds byDique v. N.J. State Police,* 603 F.3d 181, 188 (2d Cir.2010). [15] The defendants argue that the Third Circuit's decision created a circuit split on the issue and that, "if judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy."*Pearson v. Callahan,* 555 U.S. 223, 245,

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (alteration and internal quotation marks omitted).

**\*10  [8]**  Although disagreement among circuit courts may imply a legal principle is not "beyond debate," and thus not clearly established, qualified immunity is not the "guaranteed product of disuniform views of the law in the other federal, or state, courts, and the fact that a single judge, or even a group of judges, disagrees about the contours of a right does not automatically render the law unclear."*Safford Unified Sch. Dist. No. 1 v. Redding,* 557 U.S. 364, 378, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009). More importantly, however, "[i]f the right is clearly established by decisional authority of the Supreme Court or of this Circuit, our inquiry should come to an end."*Hopkins v. Bonvicino,* 573 F.3d 752, 772 (9th Cir.2009) (alteration in original) (internal quotation marks omitted). Only in the absence of binding precedent do we consider other sources of decisional law such as out-of-circuit cases. *See Boyd v. Benton Cnty.,* 374 F.3d 773, 781 (9th Cir.2004).

Because *Butler* unambiguously held due process is violated where a police officer fails to disclose material, exculpatory evidence, our inquiry is over. We hold that, at the time of the relevant events in these cases, circuit precedent clearly established that police officers were bound by *Brady* 's disclosure requirements.

## II. The specific evidence allegedly withheld in these cases was clearly established to be *Brady* material.

Even though it was clearly established at the time of the investigations that police officers were bound to disclose *Brady* evidence, we must next consider whether every reasonable police officer would have understood the specific evidence allegedly withheld was clearly subject to *Brady's* disclosure requirements.

We note the officers argued in the district court only that the law did not clearly establish their duty to disclose *Brady* evidence *at all.*Similarly, the officers' opening briefs on appeal framed the question presented as whether, in 1984 and 1991, there was "an absence of clearly established law as to whether police officers were bound by the disclosure obligations of *Brady.*"Elsewhere in their briefs, the officers did obliquely suggest that, even if the law established officers' duty to disclose evidence under *Brady* generally, their duty to disclose the specific evidence allegedly withheld in these two cases was not clear. [16]

**[9]  [10]**  "Absent exceptional circumstances, we generally will not consider arguments raised for the first time on appeal, although we have discretion to do so."*AlohaCare v. Hawaii, Dept. of Human Servs.,* 572 F.3d 740, 744 (9th Cir.2009) (citation omitted). Moreover, "[n]ormally we decline to address an issue that is simply mentioned but not argued."*Arredondo v. Ortiz,* 365 F.3d 778, 781 (9th Cir.2004). Nevertheless, because the issue is purely one of law, and because our addressing it at this juncture will not prejudice the plaintiffs, we will do so here. *See Kimes v. Stone,* 84 F.3d 1121, 1126 (9th Cir.1996).

**\*11  [11]**  In recent cases, the Supreme Court has cautioned us "not to define clearly established law at a high level of generality."*Ashcroft v. al–Kidd,* 563 U.S. 731, 131 S.Ct. 2074, 2084, 179 L.Ed.2d 1149 (2011). At the same time, "[f]or a legal principle to be clearly established, it is not necessary that 'the very action in question has previously been held unlawful,' " but rather that " 'in the light of pre-existing law the unlawfulness [is] apparent.'"*Fogel v. Collins,* 531 F.3d 824, 833 (9th Cir.2008) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (alteration in original). In other words, "the 'contours of [the] right [must be] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' "*al–Kidd,* 131 S.Ct. at 2083 (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034) (first alteration in original).

In the Fourth Amendment context, for example, the Court has explained the "general proposition ... that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."*Id.* This is because "[q]ualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."*Sheehan,* 135 S.Ct. at 1776.

Here, the right being violated is, by its terms, significantly more specific than the "extremely abstract" right of freedom from unreasonable searches and seizures. *See Anderson,* 483 U.S. at 639, 107 S.Ct. 3034. *Brady* defines the type of material the government is obligated to disclose concretely and specifically as "favorable to the accused, either because it is exculpatory, or because it is impeaching."*Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Unlike the broad touchstone of "unreasonableness," the contours of a defendant's right to *Brady* material are focused and clear.

**Exhibit "1"**

Furthermore, although the right at issue cannot be defined at too high a level of generality, it cannot be defined "too narrowly," either. *Tennison v. City & Cnty. of San Francisco,* 570 F.3d 1078, 1093 (9th Cir.2009). In *Tennison,* we addressed police officers' claims of qualified immunity relating to alleged *Brady* violations. *See id.* at 1078. The plaintiff alleged the investigating officers failed to disclose the confession of an alternative suspect. *See id.* at 1093. The officers argued their duty to disclose "a confession that was made after a guilty verdict was rendered, that was 'inherently unbelievable,' and that was given by someone who earlier had denied involvement in the murder" was not clearly established. *See id.* We rejected this argument, explaining that

[f]or a legal principle to be clearly established, it is not necessary that the very action in question has previously been held unlawful. Rather, the dispositive inquiry is whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted.

**\*12** The Inspectors received a Mirandized confession by someone who had been named by a reliable witness, known to the officers, who recounted events surrounding the murder in detail, and whose account contradicted that of the prosecution's witnesses. *The evidence certainly undermines confidence in the outcome of the trial.* Thus, it would have been clear to a reasonable officer that such material should have been disclosed to the defense. *See Barker v. Fleming,* 423 F.3d 1085, 1095 (9th Cir.2005) ("It is well settled that evidence impeaching the testimony of a government witness falls within the *Brady* rule....")

*Id.* at 1093–94 (some internal citations, quotation marks and alterations omitted) (emphasis added).

As in *Tennison,* law predating the investigations in both of these cases clearly established that the type of evidence allegedly withheld—including impeachment and alternative suspect evidence—fell within *Brady*'s scope. The officers' assertions of qualified immunity, therefore, fail. We address each item of evidence in turn below.

**A. O'Connell Evidence**

We first address the evidence O'Connell has alleged the defendant police officers withheld, including evidence impeaching the statements of the three eyewitnesses to testify and information regarding a previous attempt on the victim's life.

**1. Druecker, Villareal and Soucy Statements**

**[12]**   O'Connell argues the officers should have turned over evidence relating to the eyewitness identifications made by Druecker, Villareal and Soucy.

Druecker, who was the only eyewitness to the shooting, testified at trial that he was able to identify O'Connell as the killer. But the officers never disclosed that Druecker said he saw the shooter only in profile, asked to be hypnotized because he could not remember what the shooter looked like, and recalled the shooter did not have a mustache unlike every man depicted in the photo lineup.

Villareal, who saw the shooter flee in a yellow Pinto, testified at trial he was unsure whether O'Connell was the shooter. Detective Smith cast doubt on this statement by testifying Villareal had readily chosen O'Connell from a photo lineup. But the officers failed to disclose that Villareal, when shown the photo lineup, selected two photographs and said that O'Connell "looked like the person who was there, but I'm not positive."

Soucy, a neighbor of French's ex-wife, testified at trial that he recognized O'Connell from the lineup and that he was confident O'Connell was the same person he had seen kissing Lyon. He further testified this man drove a yellow Pinto. But again, the officers failed to disclose their handwritten notes, which said Soucy identified "# 3 & poss[ibly] # 1" and "picked out # 3 as poss [ible] suspect because of face but hair was curlier."

Had this evidence been disclosed, the defense could have used it to impeach the eyewitnesses' identifications of O'Connell as the killer. The law in 1984 made clear that impeachment evidence must be disclosed under *Brady.* For decades prior, the Supreme Court had explained that the presentation of false testimony violated due process. In its 1972 opinion in *Giglio,* the Court reasoned *Brady* encompassed evidence implicating the credibility of a government witness:

**\*13**   As long ago as *Mooney v. Holohan,* 294 U.S. 103, 112 [55 S.Ct. 340, 79 L.Ed. 791] (1935), this Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary demands of justice."....In *Napue v. Illinois,* 360 U.S. 264 [79 S.Ct. 1173, 3 L.Ed.2d 1217] (1959), we said, "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected

**Exhibit "1"**

when it appears."*Id.,* at 269 [79 S.Ct. 1173]. Thereafter *Brady v. Maryland,* 373 U.S. at 87 [83 S.Ct. 1194], held that suppression of material evidence justifies a new trial "irrespective of the good faith or bad faith of the prosecution."*When the "reliability of a given witness may well be determinative of guilt or innocence,"nondisclosure of evidence affecting credibility falls within this general rule.*

405 U.S. at 153–54, 92 S.Ct. 763 (emphasis added) (some citations omitted). In *United States v. Bagley,* 473 U.S. 667, 676–77, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Court reaffirmed this principle, citing *Giglio* for the proposition that "[i]mpeachment evidence ... as well as exculpatory evidence, falls within the *Brady* rule."*Id.* at 676, 105 S.Ct. 3375.

Here, the disclosure of Druecker's request for hypnosis, observation that the shooter—unlike every person depicted in the lineup—did not have a mustache, and uncertainty regarding his identification would have cast serious doubt on his identification of O'Connell at trial. Similarly, the disclosure of Soucy's choice of *two* men from the photo lineup would have undermined his identification of O'Connell. The disclosure of Villareal's hesitancy and uncertainty when shown the photo lineup would have undercut Smith's testimony that Villareal readily chose O'Connell's photo from the lineup and was prevaricating on the stand. Because it was clearly established by 1984 that police officers were bound by *Brady,* and that evidence undermining the credibility of government witnesses fell within *Brady*'s ambit, it would have been clear to any reasonable officer that the nondisclosure of this evidence was unlawful.

**2. Evidence of a separate attempt on victim's life**

 **[13]** O'Connell also alleges the police officers failed to disclose evidence of a previous attempt on the victim's life. The officers' notes reveal that Lyon, French's ex-wife, had previously attempted to run him over in her car with the assistance of Randy Smith, who was described as tall, with sandy or blond hair. This information was never disclosed to the prosecution or defense, and as a result, the defense was never able to investigate it.

As a preliminary matter, the officers argue the information about Randy Smith was a "dead end." [17] But as we explained in an earlier qualified immunity challenge based on nondisclosure of *Brady* material,

we reject the Inspectors' attempt to dismiss their *Brady* duty by downplaying the importance of the evidence. "[I]f there were questions about the reliability of the exculpatory information, it was the prerogative of the defendant and his counsel—and not of the prosecution—to exercise judgment in determining whether the defendant should make use of it," because "[t]o allow otherwise would be to appoint the fox as henhouse guard."

 **\*14** *Tennison,* 570 F.3d at 1094 (quoting *DiSimone v. Phillips,* 461 F.3d 181, 195 (2d Cir.2006)).

Any reasonable police officer in 1984 would have understood that evidence potentially inculpating another person fell within *Brady*'s scope. In *Brady* itself, the Court considered the failure to disclose an accomplice's confession that he had committed the homicide for which he and the defendant were standing trial. The Court held suppression of this evidence violated due process. *See* 373 U.S. at 86, 83 S.Ct. 1194.

Here, the officers failed to disclose evidence that another man who resembled the eyewitness description of the killer had previously tried to kill the victim. This evidence would have cast doubt on O'Connell's culpability and would have instilled French's dying declaration—in which French said the killer was someone his ex-wife used to "hang[ ]around with"—with an alternative meaning. The defendants' alleged failure to disclose this information violated O'Connell's clearly established right to evidence that "would tend to exculpate" him. *Brady,* 373 U.S. at 88, 83 S.Ct. 1194.

**B. Carrillo Evidence**

 **[14]** Carrillo argues Ditsch failed to disclose the circumstances surrounding Turner's identification of Carrillo. [18] Specifically, he alleges Ditsch failed to disclose that Turner initially chose several other photos from a "gang book"—each of which Ditsch then told Turner "could not be the suspect shooter"—before ultimately selecting Carrillo's photo, which Ditsch affirmed as the "right choice." He also alleges Ditsch failed to disclose that he threatened Turner upon learning Turner planned to recant his identification of Carrillo before Carrillo's second trial. Ditsch counters that the "potentially exculpatory nature of such evidence" would not have been clear to a reasonable police officer in 1991.

During the first trial, Turner testified for the state that he was able to positively identify Carrillo. Had the evidence of Turner's choice of several other photos and Ditsch's

**Exhibit "1"**

suggestive comments been disclosed, the defense could have used that information to impeach Turner's identification at the first trial and bolster his recantation at the second trial.

Furthermore, this evidence would also have undercut Ditsch's testimony at the second trial that Turner was "absolutely certain" of his identification of Carrillo. Ditsch's effort to paint Turner's selection as unequivocal implicitly recognizes that evidence of hesitancy and earlier misidentification would have been very helpful to the defense in impeaching Turner's original identification, not to mention supporting the veracity of Turner's recantation. Likewise, information that Ditsch had coached Turner's identification would have contradicted Ditsch's testimony that Turner independently selected Carrillo from the gang book and photo lineup and cast serious doubt on Ditsch's testimony that Turner's recantation was not genuine. Finally, evidence that Ditsch threatened Turner with negative consequences if he recanted would have further undermined Ditsch's rebuttal of Turner's recantation.

 **\*15** As previously discussed, the law in 1991 clearly established that evidence impeaching the credibility of a government witness was required to be disclosed under *Brady.See Bagley,* 473 U.S. at 676, 105 S.Ct. 3375; *Giglio,* 405 U.S. at 153, 92 S.Ct. 763. Any reasonable officer would have understood the withheld evidence here would have impugned the testimony of two key government witnesses, and therefore should have been disclosed.

Other circuits have recognized that police officers' failure to disclose the use of suggestive tactics violates *Brady.*[19] For instance, the Seventh Circuit concluded police officers could be held liable under § 1983 for "withh[olding] from the prosecutors information about their coaching of the witnesses and the fact that these witnesses earlier selected pictures from a book of mug shots that did not contain [plaintiff's] photo," because under *Brady* it was "clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information about ... the conduct of a lineup."*Newsome v. McCabe,* 256 F.3d 747, 749, 752 (7th Cir.2001).

Similarly, nearly three decades ago, the Fifth Circuit considered a § 1983 claim that law enforcement authorities engaged in suggestive identification techniques when showing witnesses a lineup. *See Geter v. Fortenberry,* 849 F.2d 1550, 1559–60 (5th Cir.1988). The plaintiff alleged the officers failed to disclose this evidence and that it would have been "favorable, and exculpatory, as it would permit [plaintiff] to demonstrate to the jury ... [t]hat [plaintiff's] identification in the instant cause is in all likelihood a mistaken identification due to his facial similarity to other persons and/or overzealous police investigatory techniques."*Id.* Citing *Brady,* the court held "a police officer cannot avail himself of a qualified immunity defense if he procures false identification by unlawful means or deliberately conceals exculpatory evidence, for such activity violates clearly established constitutional principles."*Id.* at 1559.

Any reasonable officer would have understood Turner's choice of multiple other photos from a gang book and coached selection of Carrillo was potential impeachment evidence required to be disclosed under *Brady.*The same is true of Ditsch's efforts to dissuade Turner from recanting his identification. The district court therefore properly denied Ditsch qualified immunity.

### CONCLUSION

The law clearly established, well before the events in these cases, that police officers were bound by *Brady* and that the evidence allegedly withheld in these cases fell within *Brady*'s scope. We therefore affirm the denial of qualified immunity in both cases and remand to the district court for further proceedings.

### AFFIRMED.

### All Citations

--- F.3d ----, 2015 WL 5024010, 15 Cal. Daily Op. Serv. 9569, 2015 Daily Journal D.A.R. 9890

Footnotes

\*   We heard these cases together and now consolidate them for disposition. *See* Fed. R.App. P. 3(b)(2); *Mattos v. Agarano,* 661 F.3d 433, 436 n. 1 (9th Cir.2011) (en banc).

**Exhibit "1"**

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

1    O'Connell's son, Nicholas O'Connell, is also party to the suit; he seeks compensation for the "wrongful denial of the society and comfort of, and companionship and familial relationship with, his father" as a result of his father's wrongful conviction and incarceration.

2    A district court's denial of a claim of qualified immunity is immediately appealable under 28 U.S.C. § 1291 notwithstanding the absence of a final judgment. *See Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

3    At this stage, we assume the version of material facts asserted by the plaintiffs, who are the non-moving parties. *See KRL v. Estate of Moore,* 512 F.3d 1184, 1189 (9th Cir.2008).

4    The complaint does not make clear which witness testified about French's dying declaration.

5    O'Connell alleges these are the same two photos that Villareal chose.

6    The official report said Ina Soucy, not Maurice, had remarked that the hair of the man who drove the yellow Pinto was curlier. O'Connell alleges the notes make clear *Maurice* Soucy, not his wife, had made this statement.

7    The transcript of Turner's testimony is unclear whether he immediately chose Carrillo's photograph from the six-pack or whether he selected someone else first.

8    Turner testified at Carrillo's second trial that his recantation was based on an interaction with the real shooter:

     Q: Now, what happened that caused you to change your mind?

     A: Well, I came into Lynwood over my grandfather['s] house because we had a little get together.... Then I was walking from my house[,] walked down the street, went to Jack–in–the–Box, and I was in Jack–in–the–Box and I walked in. I seen this ese, this cholo.

     Q: You saw a cholo? That is like a Mexican gang member?

     A: Yes.

     Q: Young Crowd gang member?

     A: Yes. And I—and I was looking. I was like glaring at him, and he was looking at me. And kept looking at each other, but you know it wasn't like staring. Then I stared at him and I was like don't I know you. And he was like what? And I was like, don't I know you, and he was like, oh, just jump; like what.

     Q: He became angry?

     A: Yeah and I—and I seen his attire and I knew he was from Young Crowds [sic].... So he was like, fool, *that's why I shot your homeboy father....*

     Q: Before you ran up out of there, did you get a good look at the guy you had the fight with?

     A: Yes, I did.

     Q: When you got to take a look at him, what did that make you think?

     A: That's the fool. That's the person who done this.

     Q: So did you, at that time, recognize him as being the person that was the passenger that night?

     A: Yes.

     Q: Did he look something like Frankie Carrillo?

     A: Looked like that guy.

     Q: When you saw him and you got into this argument with him, were you positive it was him?

     A: Positive. Surely positive.

9    During the pendency of Ditsch's appeal, the district court granted Carrillo's motion to certify this appeal as frivolous under *Chuman v. Wright,* 960 F.2d 104, 105 (9th Cir.1992), which would have allowed the case to proceed to trial while the instant appeal was pending. *See id.*Ditsch filed an urgent motion to stay the district court's order, which was granted. Carrillo then filed a motion for summary affirmance based on *Tennison v. City & County of San Francisco,* 570 F.3d 1078 (9th Cir.2009), which he argued "definitively answered" the question presented in this appeal. The motion for summary affirmance is dismissed as moot in light of this opinion.

10   Nor could they. The allegations unquestionably make out a violation of plaintiffs' right to material, exculpatory evidence. *See infra* Section II.

11   In *Carrillo,* the question presented is whether, in 1991, the law clearly established that police officers were bound by *Brady.*Because we conclude the law in this circuit clearly established that police officers were bound by *Brady* at least as far back as 1978, it follows this obligation was clearly established in 1991.

12   Although the determination of what constitutes material, exculpatory evidence may require "the exercise of legal judgment that the prosecuting attorney is better trained, not to mention better positioned, to make," police must still be expected to "recognize and determine what evidence should be preserved and turned over to the prosecutor."*Moldowan,* 578 F.3d at 380–81. The Supreme Court has held government agents "could offend the Due Process Clause of the Fifth Amendment ... by deporting potential witnesses," thereby "diminishing a defendant's opportunity to put on an effective

**Exhibit "1"**

defense," as well as by failing to preserve evidence "that might be expected to play a significant role in the suspect's defense."*California v. Trombetta,* 467 U.S. 479, 486, 488, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). As the Sixth Circuit has explained, "[i]f the police can be expected to recognize what evidence must be preserved, certainly it is not too burdensome to demand that they simply turn that same information over to the prosecutor's office."*Moldowan,* 578 F.3d at 381.

13   In recent cases, the Supreme Court has assumed for the sake of argument without explicitly holding that "controlling Court of Appeals' authority could be a dispositive source of clearly established law."*Reichle v. Howards,* —— U.S. ——, 132 S.Ct. 2088, 2094, 182 L.Ed.2d 985 (2012); *see also Carroll v. Carman,* —— U.S. ——, 135 S.Ct. 348, 350, 190 L.Ed.2d 311 (2014). None of these cases has overruled *Hope* or called its exclusive reliance on circuit precedent into question.

14   *See Walker v. City of New York,* 974 F.2d 293, 299 (2d Cir.1992) ("The constitutional duty to disclose exculpatory evidence has its roots in *Brady....* [T]he police satisfy their obligations under *Brady* when they turn exculpatory evidence over to the prosecutors."); *Owens v. Baltimore City State's Attorneys Office,* 767 F.3d 379, 401 (4th Cir.2014) (concluding that circuit precedent "unmistakably provides that, by 1988, a police officer violates clearly established constitutional law when he suppresses material exculpatory evidence in bad faith"); *Geter v. Fortenberry,* 849 F.2d 1550, 1559 (5th Cir.1988) (holding that a police officer who deliberately concealed exculpatory evidence could not claim qualified immunity in 1982); *Moldowan v. City of Warren,* 578 F.3d 351, 382 (6th Cir.2009) (holding law clearly established police officers were bound by *Brady* in 1990); *Newsome v. McCabe,* 256 F.3d 747, 752–53 (7th Cir.2001) (holding it was clearly established police officers were bound by *Brady* in 1979); *McMillian v. Johnson,* 88 F.3d 1554, 1569 (11th Cir.1996) ("[C]learly established law in 1987 and 1988 prohibited the police from concealing exculpatory or impeachment evidence.").

15   The First Circuit has also held police officers were not bound to affirmatively disclose *Brady* evidence until *Kyles. See Drumgold v. Callahan,* 707 F.3d 28, 43 (1st Cir.2013). But it distinguished the affirmative duty to disclose evidence from the duty not to deliberately suppress exculpatory evidence. Where the defendant police officer was alleged to have deliberately suppressed evidence, in violation of either *Brady* or *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), the court concluded such conduct was clearly established as unlawful in 1989. *See id.*

16   Smith and Parra note in their opening brief the passage in *Butler*"was, at most, a broad general proposition insufficient to clearly establish the law on this issue," and that the evidence withheld in that case was "significantly different than ... nondisclosure of exculpatory information regarding [the] identification [of O'Connell] as the murderer or the possibility of another suspect."Similarly, Ditsch notes the information about Turner's selection of other photos before identifying Carrillo was different from the confession we held was clearly established *Brady* evidence in *Tennison.*

17   The officers also argue O'Connell's defense counsel was aware of Randy Smith. They offer no citation for this assertion, and at this stage we must in any event take as true the version of its facts O'Connell has alleged. *See Chavez v. United States,* 683 F.3d 1102, 1108 (9th Cir.2012).

18   Carrillo also alleges Ditsch failed to disclose his membership in the Lynwood Vikings, a "white supremacist internal gang dedicated to wiping out the Young Crowd gang, including the use of fabricated evidence to obtain false convictions."Carrillo does not appeal the district court's ruling that this allegation was without merit.

19   Furthermore, the Supreme Court explicitly recognized the risk of police improperly influencing photo identifications, explaining:

> [i]t must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals.... This danger will be increased if the police ... show [the witness] the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.
>
> *Simmons v. United States,* 390 U.S. 377, 383, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Carrillo has separately alleged a *Simmons* violation, but that claim is beyond the scope of this appeal.

---

End of Document          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Exhibit "1"**

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.